## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                              Criminal No. 06-334 (PAM/JJG)

               Plaintiff,

v.                                                     **MEMORANDUM AND VERDICT**

Susan R. Theimer,

               Defendant.

_____

Defendant Susan R. Theimer is charged with one count of conspiracy in violation of 18 U.S.C. § 371, three counts of forging securities in violation of 18 U.S.C. § 513, seven counts of embezzlement by a bank officer or employee in violation of 18 U.S.C. § 656, and four counts of mail fraud in violation of 18 U.S.C. § 1341. A bench trial on the charges occurred in May 2007.[1] As explained below, the Court finds Defendant guilty of Counts One through Fourteen but not guilty of Count Fifteen of the Indictment.

## BACKGROUND

### A.    Defendant's Employment with Alliance Bank

Defendant began working for Alliance Bank in 1996. Alliance Bank operates several branches in Minnesota, including in Saint Paul and Edina. At all relevant times, the Federal Deposit Insurance Corporation insured deposits of Alliance Bank.

_____

[1] On February 7, 2007, the Court granted Defendant's request to waive a jury trial under Federal Rule of Criminal Procedure 23.

From 2000 to December 2004, Defendant worked as a vice president of private banking at the Alliance Bank branch in Edina. Her responsibilities included underwriting and administering loans to executives, professionals, and small businesses. Defendant was responsible for collecting origination fees payable to Alliance Bank as part of the loan process.

1.    Koch Financial Corporation

In approximately 2001, Defendant developed a business relationship with Jim Koch of Koch Financial Corporation, a mortgage-banking firm specializing in high-end residential mortgages. Koch Financial operates in interstate commerce by transmitting documents in interstate commerce, dealing with national banks that operate in interstate commerce, and funding millions of dollars in loan transactions for customers each year.

Koch Financial and Alliance Bank worked together to provide high-end residential mortgage loans to customers. As part of their relationship, Koch Financial and Alliance Bank shared the origination fees generated by the mortgages. After Koch Financial received the fee from the customer, it issued a check to Alliance Bank for the portion of the fees earned by Alliance Bank.

2.    Defendant's Compensation

Defendant's compensation was based on an annual salary set at the beginning of each year, as well as a bonus based on personal and bank performances the previous year. Alliance Bank approved the following compensation for Defendant: $76,973 in 2000; $80,627 in 2001; $83,677 in 2002; $88,184 in 2003; and $92,266 in 2004. Defendant's

employment terms did not authorize her to receive other compensation relating to bank business, such as commissions and fees that other lenders or customers paid.

Defendant reported directly to Darrell Mullerleile, the president of the Saint Paul and Edina branches.  Mullerleile was not authorized to modify unilaterally Defendant's compensation structure and terms.  Instead, only the chairman of the board or chief executive officer of Alliance Bank could set her compensation.

**B.     Scheme to Supplement Compensation**

In 2000, Defendant sought more compensation than Alliance Bank had approved, but was told that the chief executive officer would not increase her salary and would not use a commission-based structure.  Nonetheless, Defendant and Mullerleile discussed the opportunity to make Defendant's compensation package more lucrative.  In particular, they agreed to retain residential mortgage origination fees generated from loans collectively serviced by Koch Financial and Alliance Bank.  Customers, Koch Financial, and Alliance Bank did not know that Defendant and Mullerleile were retaining the fees. [2]

Defendant formed an entity known as A.F. Resources and opened a bank account in its name at US Bank.[3]  She used that account to hide funds diverted from Alliance

---

[2] This was not the only scheme Mullerleile used to supplement his income.  Instead of immediately depositing checks payable to Alliance Bank as bank income, Mullerleile transformed many fee checks into cashier's checks, which he then held in his desk drawer.  Mullerleile and former chief executive officer Richard Kastner used the checks as a "slush fund" to pay for travel and entertainment expenses, as well as for their own benefit.  Some checks were also held in the drawer to defer Alliance Bank income to the following year.

[3] Defendant used several variations of the name, including American Financial Resources and AFR.

Bank.  Defendant did not disclose her use of the A.F. Resources account to Alliance

Bank, bank employees other than Mullerleile, bank customers, or mortgage professionals

involved in the transactions.  Mullerleile primarily used two business names to receive

and conceal proceeds: NB Associates and LMD Associates.

Defendant and Mullerleile siphoned Alliance Bank funds through a variety of

methods.  For example, they diverted funds to their affiliated bank accounts by directing

Alliance Bank customers to issue checks payable directly to the A.F. Resources account

and by transforming payments to Alliance Bank into checks payable to the A.F.

Resources, NB Associates, or LMD Associates accounts.  They also cashed checks made

payable to Alliance Bank, and they used fee income to direct payments to third parties for

personal expenses they incurred.

    1.    <u>Diversion of Funds to Bank Accounts</u>

From May 2001 to November 2004, Defendant deposited into her A.F. Resources

account $266,542.16 in fees from Koch Financial and Alliance Bank customers.[4]  (Gov't

---

[4] Defendant contends that she withdrew $102,492.74 from A.F. Resources to either NB
Associates or LMD Associates.  (Def.'s Ex. 100-1.)  Thus, she submits that the net
deposits she received equal $164,049.42.  (<u>Id.</u>)  The Government submits that Defendant
paid Mullerleile and his affiliated accounts $91,492.74.  (Gov't Ex. 7A; Testimony of
Special Agent Michael Dudley.)  This results in an $11,000 difference, which relates to a
check payable to cash that ultimately was deposited into Mullerleile's account.  Thus, the
evidence shows that Defendant dispersed $102,492.74 to Mullerleile or his affiliated
accounts.

In addition to Defendant's payments, Mullerleile or his affiliated accounts diverted
another $63,425.89.  (Gov't Ex. 3 at 10-12; Testimony of Paul Walsh.)  Defendant aided
Mullerleile in receiving at least $7,846.25 of those funds.  (Gov't Ex. 37.)

Ex. 3 at 6; Def.'s Ex. 100, 100-1.)   The following are specific examples of how Defendant and Mullerleile diverted Alliance Bank fees to their bank accounts.

        a.      Keith Donaldson

In 2001, Keith Donaldson paid a $30,000 origination fee when he consolidated four mortgages into one with Alliance Bank.   Defendant misled Donaldson into paying the fee to A.F. Resources by stating that A.F. Resources was an Alliance Bank subsidiary.   Defendant created an invoice to Donaldson, which stated "2% broker fee on loan amount of $1,500,000.   Amount due $30,000.   Check payable to A.F. Resources." (Gov't Ex. 10.)   Donaldson gave Defendant a $30,000 check payable to A.F. Resources for the origination fee.   (Gov't Ex. 11.)   The check was deposited into the A.F. Resources bank account at US Bank.   Approximately a week later, Defendant issued a $15,000 check from her A.F. Resources account to LMD Associates.   (Def.'s Ex. 1-4.)

In 2002, Defendant directed Donaldson to pay another $22,000 in fees to American Financial Resources for a $1.1 million line of credit from Alliance Bank. Again, Defendant led Donaldson to believe the fee was being paid to an Alliance Bank subsidiary.   Defendant deposited the fee into her A.F. Resources account at US Bank. Two days later, Defendant wrote an $11,000 check to cash.   (Def.'s Ex. 7-4.)   A few months later, an $11,000 cashier's check was issued to NB Associates, with the remitter identified as Donaldson's company.   (Def.'s Ex. 7-5.)

When Donaldson renewed his line of credit in September 2003, Defendant completed a loan information worksheet.   Originally, the worksheet stated that

Donaldson owed a one percent renewal fee, which equaled $11,000. However, the worksheet was altered to eliminate the fee remarks. (Gov't Ex. 22.) In October 2003, Defendant issued an $11,000 cashier's check to AFR. Donaldson's company was the remitter, and $11,000 was withdrawn from the company's account. Defendant later deposited the cashier's check into her A.F. Resources account at US Bank. A few days later, Defendant wrote a $5,500 check from her A.F. Resources account to NB Associates. (Def.'s Ex. 20-5.)

In December 2003, an Alliance Bank employee asked Defendant whether Alliance Bank had collected a loan renewal fee on the Donaldson loan. Defendant falsely responded: "Darrell [Mullerleile] asked that we not charge that. Please delete that from your records." (Gov't Ex. 25.)

When Donaldson renewed the $1.1 million line of credit in 2004, Alliance Bank assessed a renewal fee of three-quarters of one percent, which equaled $8,250. Defendant received an $8,250 check from Donaldson to Alliance Bank for payment. Thereafter, Defendant caused Alliance Bank to issue a cashier's check payable to AFR for $8,250, and deposited the cashier's check into her A.F. Resources account at US Bank. In November 2004, an Alliance Bank employee asked Defendant whether Alliance Bank had collected the renewal fee. Defendant falsely responded that Alliance Bank had waived the fee. (Gov't Ex. 31.)

      b.    Lawrence Kladek

In 2003, in connection with a $4 million line of credit that Alliance Bank extended to Lawrence Kladek, Defendant signed closing documents stating that a $40,000 origination fee belonged to Alliance Bank as the lender.  Defendant took half of the $40,000 fee by endorsing and depositing a cashier's check made payable to Mortgage Works into her A.F. Resources bank account at US Bank.  She then issued a $10,000 check to LMD Associates from her A.F. Resources account.

Kladek took out a $2 million loan from Alliance Bank in 2004.  In March 2004, Defendant debited Kladek's account $20,000 for an origination fee, and issued a $20,000 cashier's check identifying Kladek as the remitter.  Defendant then deposited a $20,000 cashier's check, which was made payable to A.F. Resources, into her A.F. Resources account at US Bank. (Gov't Ex. 28.)  A few days later, Defendant issued a check to NB Associates for $10,000 from her A.F. Resources account.  (Def.'s Ex. 30-4.)

Defendant altered a loan document to eliminate references to the origination fee after a bank participating in the loan called to inquire why it was not receiving a share of the fee.  (Gov't Ex. 27, Testimony of Collette Flaherty.)  According to Defendant, Mullerleile instructed her to make the alteration.

      c.    Daryll Dykes

In December 2003, Defendant directed that two sets of loan documents be prepared for a mortgage loan to Alliance Bank customer Daryll Dykes—one with a one percent fee and one without the fee.  (Gov't Ex. 26A; Testimony of Cindy Cole Sapletal.)

She also directed that $16,000 be debited from Dykes's account for the origination fee. The same day, Defendant signed a $16,000 cashier's check made payable to AFR, identifying Dykes as the remitter, and deposited the check into her A.F. Resources account at US Bank.  She also issued an $11,780 check from her A.F. Resources account to NB Associates.[5]  (Def.'s Ex. 24-7.)

> d.     Koch Financial Fees to Alliance Bank

In addition to payments from Alliance Bank customers, Defendant deposited into her A.F. Resources account fees earned by Alliance Bank under its fee-sharing arrangement with Koch Financial.  For example, in late December 2003, Koch Financial issued a $7,598.75 check to Alliance Bank for loan fees.  A few days later, Defendant transformed the check into a cashier's check made payable to AFR, identifying Daryll Dykes as a remitter.  She then deposited the check into her A.F. Resources account at US Bank.

From May 2001 to November 2004, Defendant deposited $85,812.35 in fees payable to Alliance Bank from Koch Financial into her A.F. Resources account.[6]  (Def.'s Exs. 99-1, 100-1.)   Defendant contends that $26,862.74 of that amount should be attributed to Mullerleile and only $58,949.61 to her.  (Def.'s Ex. 99-1.)

---

[5] Defendant submits that the $11,780 was a combination of $8,000 relating to the Dykes transaction and $3,780 as a result of a Koch Financial transaction.

[6] Defendant also deposited a $297.50 check made payable to Alliance Bank from Koch Financial directly into her personal checking account at Alliance Bank.  (Def.'s Exs. 100, 102.)

e.      Cashier's Checks to Koch Financial

Defendant also deposited into her A.F. Resources account checks from Alliance Bank to Koch Financial.  For example, in April 2002, a $2,750 Alliance Bank cashier's check was issued to Koch Financial, with an Alliance Bank customer identified as the remitter.  (Gov't Ex. 56.)  James Koch purportedly endorsed the check to A.F. Resources for deposit only.  However, Koch testified that he did not sign the check, permitted no one to sign his name, and had no knowledge of the check.  Defendant deposited the funds into her A.F. Resources account.  (Def.'s Ex. 98.)

In October 2003, Defendant signed a $3,832.49 cashier's check to Koch Building and Development, identifying an Alliance Bank customer as the remitter.  (Gov't Ex. 56.)  Koch testified that he never received the funds, although his name is forged as an endorsement on the back of the check.  Defendant deposited the funds into her A.F. Resources account. (Def.'s Ex. 98.)

In July 2004, Defendant signed an $8,250 cashier's check payable to Koch Development/AFR.  James Koch purportedly endorsed the check to AFR for deposit only.  However, Koch testified that he did not sign the check, permitted no one to sign his name, and had no knowledge of the check.  Defendant deposited the funds into her A.F. Resources account.  (Def.'s Ex. 98.)

2.      Defendant Transformed Checks Payable to Alliance Bank into Cash

In addition to depositing checks into her A.F. Resources account, Defendant cashed checks paid to Alliance Bank for its share of loan fees.  To receive the cash,

Defendant took checks payable to Alliance Bank under the fee-sharing agreements, forged bank customers' signatures and/or their account numbers on the backs of the checks, falsely stated that Alliance Bank was refunding the fees to bank customers, and cashed out the checks. (See Gov't Exs. 3, 20, 55.)

The cash-out transactions are traced to Defendant both by examining cash deposits into her bank account and by her handwritten forgeries on the backs of the checks. In addition, almost all cashed-out checks, including all Koch Financial checks negotiated while Alliance Bank still employed Defendant, were cashed at the Edina branch, where Defendant was a vice president and Mullerleile was branch president.

The Government contends that Defendant and Mullerleile misappropriated $151,730.40 in fee income from Alliance Bank using cash-out transactions.[7] (Gov't Ex. 3 at 15-16; Testimony of Thomas Danielson.) In particular, it contends that Defendant received $130,035.79 in cash-out transactions and Mullerleile received $21,694.61. (Gov't Ex. 3 at 15-16.)

Defendant contends that she received only $55,350 in cash payments.[8] (Def.'s Exs. 99-100.) She advances several arguments to support her calculation. First, Defendant notes that the records reveal no cash expenditures by her. She therefore asks

---

[7] Most of the cash-out transactions, $107,210.25, derived from checks payable to Alliance Bank from Koch Financial pursuant to the fee-sharing agreement. Defendant contends that she received only $43,803.03 of the cashed checks from Koch Financial, and Mullerleile received $63,407.22. (Def.'s Ex. 99, 99-1.)

[8] In particular, Defendant contends that she received $43,803.03 from cashing Koch Financial checks and $11,546.97 from cashing checks of Alliance Bank customers. (Def.'s Ex. 99.)

the Court to presume that she deposited all cash payments she received into her A.F. Resources account and made no cash expenditures.  However, evidence indicates that Defendant received more cash than she deposited into her account.  Notably, all checks were cashed at the Edina branch and there is no evidence that any other individual received the cash.  Furthermore, Defendant's handwriting is on the back of most of the checks cashed.  Finally, Defendant's expert admitted that the records indicate that Defendant cashed the checks and received the cash.  He also admitted that Defendant cashed much more than she deposited into her A.F. Resources bank account.  In addition, he admitted that the records do not show that Mullerleile deposited much of the cash he purportedly received from Defendant.  (Testimony of Paul Walsh.)  Thus, the evidence does not support Defendant's contention on this point.

Second, Defendant contends that the Government's calculation erroneously includes several amounts that she did not receive.  In particular, Defendant contends she received no money from a September 2003 transaction involving Athletica, and submits that she could not have been involved in the transaction because the transaction occurred in Saint Paul.  Although no evidence unequivocally substantiates that Defendant received money from the Athletica transaction, the evidence shows that Defendant was involved in the transaction.  On July 15, 2003, Defendant debited the Athletica account by $3,150.98, and a cashier's check made payable to Alliance Bank was issued for the same amount, with the remitter identified as Athletica.  (Def.'s Ex. 103.)  In September 2003, a $2,032.41 cashier's check was issued to Mendakota Country Club, apparently for

Mullerleile's club dues.  The remaining $1,118.57 was cashed out.  Thus, Defendant was involved in the transaction, which resulted in Mullerleile receiving money for his personal benefit.

Defendant also contends that she was not involved in cashing $10,160 in checks in 2000.  She submits that the checks were cashed before any fee-sharing agreement between Defendant and Mullerleile was in place and before she established her A.F. Resources account in April 2001.  (Def.'s Ex. 99; Testimony of Paul Walsh.)  Defendant was involved directly in the transactions.  In particular, Defendant issued two cashier's checks payable to Accredited Investors on July 24, 2000.  (Def.'s Ex. 40.)  Each check was for $4,500 and identified Ed Stec as the remitter.  On the back of each check appears the endorsement: "Accredited Investors Willis T. Heipel Principal."  (Id.)  On October 20, 2000, Defendant directed that $1,160 be withdrawn from the account of Alliance Bank customer Gary Hansen for payment of a "mortgage increase fee."  (Def.'s Ex. 41.)  The same day, Defendant signed a cashier's check to Gary Hansen, identifying him as the remitter.  (Id.)

Mullerleile testified that he and Defendant discussed their fee-sharing scheme sometime in 2000.  However, he did not provide an exact date as to when their scheme commenced, so it is unclear whether the checks were cashed as part of their scheme. Furthermore, the Government provided no other proof that Defendant retained cash from these transactions.  Thus, although Defendant was involved in the transactions, the

Government failed to prove beyond a reasonable doubt that she received proceeds from the transactions.[9]

Finally, Defendant submits that she is not responsible for various Koch Financial checks received after she ceased working for Alliance Bank. Those checks total $13,765.23. (Def.'s Ex. 101.) Evidence shows that Mullerleile used funds from these checks for his personal benefit. Moreover, there is no evidence that shows Defendant aided Mullerleile in retaining the fees. In fact, evidence establishes that Defendant took affirmative steps to end her participation in the conspiracy by terminating her employment at Alliance Bank. Accordingly, Defendant is not responsible for this loss to Alliance Bank.[10]

3.      Payments on Defendant's Personal Credit Card

Defendant transformed fee-sharing checks earned by Alliance Bank into payments to her personal credit cards in April 2002, October 2002, and May 2003. These payments were sent by United States mail from Minnesota to her credit card company in Delaware. In particular, Defendant used $705.11 from a checking account of an Alliance Bank customer to obtain a cashier's check payable to Bankcard Services in April 2002. (Gov't

---

[9] The Government also relies on two checks that Mullerleile issued to Defendant in 2000: one for $7,500 in April 2000 and one for $5,000 in November 2000. (Gov't Ex. 44.) However, Mullerleile explained Defendant received the $7,500 check as payment for generating an employment contact, and that he was unsure why he issued the $5,000 check. (Testimony of Darrell Mullerleile.) The Government presented no evidence that Defendant received either the $7,500 or the $5,000 as part of the fee-sharing scheme alleged in the Indictment.

[10] Likewise, evidence indicates that Defendant had no involvement with other diversions by Mullerleile such as the Cue Properties diversion and the BB7 diversion. (Testimony of Thomas Danielson.)

Ex. 32.)    In October 2002, Defendant transformed $2,150 of fee income from Koch

Financial into a cashier's check issued to Bankcard Services.   (Gov't Ex. 33.)   In May

2003, Defendant used proceeds from five checks from a Koch Financial account to obtain

a $6,655 cashier's check.   Defendant signed the cashier's check, which was issued to

Bankcard Services.   Defendant added personal account information only to the external

copy of the check and not to Alliance Bank's internal record of the cashier's check.

(Gov't Ex. 19.)    Thus, Defendant used $9,510.11 in funds that belonged to Alliance

Bank to pay her personal credit card balances.   (Gov't Ex. 3 at 10; Def.'s Ex. 100.)

**E.     Defendant's Employment with Signature Bank**

In November 2004, while still employed at Alliance Bank, Defendant interviewed

for a position with Signature Bank.   During the interview, Defendant disclosed that she

had retained fee income generated for Alliance Bank and that Mullerleile approved her

receiving the fees as supplemental income.   She further reported that the fee-sharing

arrangement generated between $50,000 and $100,000 per year and had totaled

approximately $225,000 over several years.   Defendant requested that Signature Bank

allow her to receive a similar portion of fees generated by Signature Bank.   When

Defendant began working at Signature Bank in January 2005, her employment agreement

allowed Defendant to receive origination fees to supplement her income.

**DISCUSSION**

**A.     Conspiracy**

Count One of the Indictment alleges that Defendant violated 18 U.S.C. § 371 by

conspiring with Mullerleile and Jane Turbes to make, utter, and possess forged securities;

to embezzle bank funds; and to commit mail fraud.  "Conspiracy is an . . . agreement to

commit an unlawful act."  United States v. Pullman, 187 F.3d 816, 820 (8th Cir. 1999)

(quoting Iannelli v. United States, 420 U.S. 770, 777 (1975)).  "Once a conspiracy is

established, even slight evidence connecting a defendant to the conspiracy may be

sufficient to prove the defendant's involvement."  Id. (citations omitted).  The

Government must prove three elements beyond a reasonable doubt: (1) a conspiracy

existed for an illegal purpose; (2) Defendant knew of the conspiracy; and (3) Defendant

knowingly joined in it.  United States v. Alama, 486 F.3d 1062, 1064 (8th Cir. 2007)

(citation omitted).

The Government proved beyond a reasonable doubt that Defendant knowingly

conspired with Mullerleile to make, utter, and possess forged securities; to willfully

misapply and embezzle Alliance Bank funds; and to knowingly commit mail fraud.[11]

---

[11] However, the Government failed to prove that Defendant and Jane Turbes were linked
to the same conspiracy.  Turbes was the vice president of commercial lending at Alliance
Bank.  After the chief executive officer refused to provide Turbes with a salary increase,
Mullerleile suggested that Turbes supplement her compensation by retaining fee income
on commercial loan transactions.  The scheme Mullerleile and Turbes carried out was
similar to the scheme between Mullerleile and Defendant, as Turbes issued checks in
Alliance Bank customers' names, forged the customers' names on the checks, cashed the
checks, and split the cash with Mullerleile.

Defendant and Mullerleile diverted payments intended to pay for Alliance Bank services and used the funds for their own benefit. They transformed stolen fee checks into other checks, which they then deposited into their bank accounts. In addition, they cashed fee checks and used the currency for their own benefit. Defendant also converted fraudulently obtained fees into other checks, which she then mailed to pay her personal bills. To do so, Defendant forged endorsements of Alliance Bank customers and others on numerous checks.

Defendant argues that she had a good faith belief that she was entitled to keep a portion of the fee income earned and therefore did not enter into a criminal agreement. She relies on evidence that she disclosed to a potential employer that she retained certain fees as supplemental income. The record as a whole belies her contention. First, Alliance Bank employment policies warned employees that receiving "a fee, commission, gift or item in exchange for a desired business transaction with the bank" violated federal law. (Gov't Ex. 9.) The policies also expressly prohibited employees from soliciting for themselves anything of value from anyone in return for any business or service and from

_____

However, the Government presented no evidence that Defendant agreed to the fee-sharing arrangement between Mullerleile and Turbes. See Pullman, 187 F.3d at 820 ("The agreement is the essential evil at which the crime of conspiracy is directed.") Indeed, the Government failed to prove that Defendant knew about the agreement between Mullerleile and Turbes, or that Turbes knew about the fee-sharing arrangement between Mullerleile and Defendant. In fact, Turbes testified that she did not know the identity of either A.F. Resources or NB Associates, key entities involved in the conspiracy between Defendant and Mullerleile. The only evidence linking Defendant to Turbes was a check issued to Turbes and signed by Defendant (Gov't Ex. 40), but Turbes provided a legitimate business reason for the check. Accordingly, the Court finds that multiple conspiracies existed and that Defendant was not involved in the conspiracy between Mullerleile and Turbes.

accepting anything of value "other than bonafide salary, fees, or other compensation paid in the usual course of business from anyone in connection with the business of the bank, either before or after a transaction is discussed or closed." (Id.)  Second, Defendant and Mullerleile took affirmative acts to conceal their agreement from other bank employees and customers.   Defendant blatantly misled Alliance Bank customers to make direct payments to A.F. Resources, altered documents relating to loan fees, and forged signatures of Alliance Bank customers.  She repeatedly created multiple checks to divert funds, in effect laundering the stolen bank fees and making discovery of the payments more difficult.   She made false and misleading statements when bank employees questioned her about specific transactions related to embezzled bank fees, and she asked others to alter their records.  Finally, Defendant declared none of the fees as income on her personal income tax forms,[12] and Alliance Bank did not report the fees as income, as would be required if the fees were compensation known and approved by Alliance Bank. In sum, ample evidence contravenes Defendant's contention that she had a good faith belief that she lawfully retained Alliance Bank funds.  Defendant is guilty of knowingly conspiring with Mullerleile to commit illegal acts and therefore is guilty of Count One of the Indictment.

## B.    Forged Securities

Counts Two through Four of the Indictment charge Defendant with making, uttering, and possessing a forged security in violation of 18 U.S.C. § 513.  An individual

---

[12] In contrast, Defendant declared the fee income she received while at Signature Bank, where she had negotiated receipt of fee income as part of her compensation package.

violates § 513 by making, uttering, or possessing a forged security with intent to deceive an organization that operates in (or the activities of which affect) interstate commerce. 18 U.S.C. § 513.

Defendant advances two arguments.  First, she contends that the Koch Financial checks made payable to Alliance Bank were genuine documents—not forged securities. A forged security is "a document that purports to be genuine but is not because it has been falsely altered, completed, signed, or endorsed, or contains a false addition thereto or insertion therein, or is a combination of parts of two or more genuine documents." Id. The evidence shows beyond a reasonable doubt that Defendant falsely endorsed and/or made false additions to several checks payable from Koch Financial Corporation to Alliance Bank.  Specifically, she forged the endorsement of a bank customer on Check 3487 dated May 30, 2003 in the amount of $2,500; on Check 3488 dated May 30, 2003 in the amount of $825; and on Check 3489 dated May 30, 2003 in the amount of $610. (Gov't Ex. 20.)  She also wrote customers' bank account numbers on the backs of the checks.  The Alliance Bank customers testified that they neither endorsed the checks nor wrote their account numbers on the checks.  Others testified that the endorsements were in Defendant's handwriting.  (Testimony of Cindy Cole Sapletal; Testimony of Paul Walsh.)  Furthermore, Mullerleile expressly testified that Defendant forged signatures of Alliance Bank customers to divert fee income.  Thus, the Government proved beyond a reasonable doubt that Defendant forged the securities.

18

Second, Defendant argues that the Government failed to prove that she signed the Alliance Bank customers' names with intent to deceive.  However, Defendant blatantly misled Alliance Bank customers, altered bank documents and instructed other employees to do so, and lied to bank employees when questioned about specific loan transactions. These actions show that Defendant acted with intent to deceive.  The Government proved beyond a reasonable doubt that Defendant is guilty of Counts Two through Four of the Indictment.

## C.   Embezzlement by a Bank Officer or Employee

Counts Five through Eleven of the Indictment charge Defendant with embezzling bank funds in violation of 18 U.S.C. § 656.  To establish that Defendant is guilty of embezzlement, the Government must prove beyond a reasonable doubt five elements: (1) Defendant was an officer or employee of Alliance Bank; (2) Defendant embezzled or misapplied funds of Alliance Bank; (3) the amount embezzled or misapplied was more than $1,000; (4) Defendant did so with the intent to injure or defraud Alliance Bank; and (5) Alliance Bank was insured by the FDIC.  See Eighth Circuit Manual of Model Jury Instructions § 6.18.656.[13]

To act with intent to injure means "to act with intent to cause pecuniary loss."  Id. To act with intent to defraud means "to act with intent to deceive or cheat, for the purpose of causing a financial loss to someone else or bringing about a financial gain to the

---

[13] The Model Jury Instructions state that the third element requires proof that the Defendant embezzled or misapplied more than $100 to constitute a felony offense. However, Congress amended 18 U.S.C. § 656 in 1996 to change $100 to $1,000.  See Pub. L. 104-294 § 606(a).

defendant or another." Id. Intent to injure or defraud a bank is proved by showing a "knowing voluntary act by the defendant, the natural tendency of which may have been to injure the bank even though such may not have been his motive." Id. (quoting United States v. Farrell, 609 F.2d 816, 820 (5th Cir. 1980)). The intent may be shown by circumstantial evidence. Id. (citing United States v. Mohr, 728 F.2d 1132, 1134-35 (8th Cir. 1984); Seals v. United States, 221 F.2d 243, 248 (8th Cir. 1955)). Finally, the Government need not prove that Defendant knew she was violating the law. Id. (citing United States v. Dougherty, 763 F.2d 970, 973-74 (8th Cir. 1985)).

The Government proved beyond a reasonable doubt that Defendant and Mullerleile violated 18 U.S.C. § 656 by misapplying and embezzling funds from Alliance Bank. Specifically relating to Counts Five, Six, Ten, and Eleven of the Indictment, the Government established that Defendant and Mullerleile embezzled the following relating to the Donaldson transactions: $30,000 in May 2001; $22,000 in October 2002; $11,000 in November 2003; $8,250 in November 2004. Relating to Count Seven, the Government established that Defendant and Mullerleile embezzled $20,000 in February 2003 from the Kladek transaction. Relating to Count Eight, the Government established that Defendant and Mullerleile embezzled $6,655 in fees that Koch Financial paid to Alliance Bank in May 2003. Relating to Count Nine, the Government established that Defendant and Mullerleile embezzled $3,935 in May 2003 by forging names of Alliance Bank customers and diverting funds for personal use.

Defendant contends that she did not act with intent to injure or defraud Alliance Bank. Rather, she submits that she had a good faith belief that Mullerleile, the branch president, permitted her to retain the fee income. Ample evidence shows that Defendant acted with both intent to injure and intent to defraud. Defendant knowingly took funds payable to Alliance Bank. To do so, she misled bank customers, altered bank documents, forged signatures, and concealed her scheme by lying to bank employees when questioned about specific loan transactions. The Government proved beyond a reasonable doubt that Defendant is guilty of Counts Five through Eleven of the Indictment.

**D.     Mail Fraud**

Counts Twelve through Fifteen of the Indictment charge Defendant with mail fraud in violation of 18 U.S.C. § 1341. Section 1341 prohibits using the mails to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Thus, to establish that Defendant is guilty of mail fraud, the Government must prove "(1) the existence of a scheme to defraud, and (2) the use of the mails . . . for purposes of executing the scheme." United States v. Jennings, 487 F.3d 564, 577 (8th Cir. 2007) (citation omitted).

Defendant mailed the following credit card payments to Bankcard Services: $705.11 in April 2002; $2,150 in October 2002; and $6,655 in May 2003. Defendant converted fee-sharing checks earned by Alliance Bank to make these payments.

Defendant submits that she lacked intent to defraud because she had a good faith belief that she was entitled to retain the fee income.  To the contrary, the evidence shows that Defendant intended to defraud Alliance Bank, as well as its customers and affiliates, by forging signatures, concealing fee diversions, and altering documents.  The Government proved beyond a reasonable doubt that Defendant is guilty of mail fraud as alleged in Counts Twelve through Fourteen of the Indictment.

However, the Government failed to prove that Defendant aided Mullerleile in using $7,875 in Alliance Bank fees to pay for his personal credit card charges.  Rather, the evidence indicates that only Mullerleile and Turbes conspired to obtain the $7,875.  (Gov't Ex. 35.)   Because no evidence establishes that Defendant was involved in obtaining the $7,875, she is not guilty of Count Fifteen of the Indictment.

**CONCLUSION**

The Government proved beyond a reasonable doubt that Defendant is guilty of Counts One through Fourteen of the Indictment.  However, the Government failed to prove that Defendant is guilty of Count Fifteen.

The United States Probation Office shall conduct a presentence investigation in this matter.  The Court will schedule a sentencing hearing upon receipt of the presentence investigation report.  In the meantime, current terms of Defendant's bond remain in effect.

Dated:  July 18, 2007

s/ Paul A. Magnuson
Paul A. Magnuson
United States District Court Judge